title to the securities but only an equitable one at best, she cannot maintain an action for their delivery to her.

Besides, the provisions of the will are certainly broad enough to cover the expenses of the last illness of the wife, and in the absence of any separate property of the wife to cover the expenses of her burial. The administrators of the wife were entitled to retain possession of the securities for the purpose of realizing sufficient money to pay funeral expenses and the expenses of her last sickness, and therefore the plaintiff is not entitled to immediate possession of them. The situation is quite similar to that disclosed in Seaward v. Davis, 198 N. Y. 415, 91 N. E. 1107, and the plaintiff can pursue her remedy in equity according to the procedure there pointed out.

By inadvertence undoubtedly a judgment final in form was entered on the demurrer, instead of an interlocutory one. No objection is made on this ground in the briefs and on the argument the parties treated the judgment as interlocutory and the majority of the court so treats it in the decision made, and I so regard it and vote for an affirmance of the judgment sustaining the demurrer, giving leave to the plaintiff to amend her complaint upon paying costs of the trial court and of this appeal.

---

BLAISDELL v. LONG ISLAND R. CO.

(Supreme Court, Appellate Division, Second Department. July 25, 1912.)

1. CARRIERS (§ 304*)—INVITEE AT STATION—CARE REQUIRED.

While a railroad company does not owe a mere invitee at a railroad station to meet an arriving passenger the high degree of care due passengers, it must exercise reasonable care to prevent danger from vicious practices of third parties of which it has actual or constructive knowledge.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1104, 1110–1114, 1124, 1242; Dec. Dig. § 304.*]

2. CARRIERS (§ 316*)—ASSAULT BY THIRD PARTY—BURDEN OF PROOF.

In an invitee's action against a railroad company for an assault at a station by a person of known vicious habits, the burden was on the plaintiff to show that the defendant had actual or constructive knowledge of the assailant's habits and employed or harbored him at the station, and that such acts were the proximate cause of the injury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1261, 1262, 1283, 1285–1294; Dec. Dig. § 316.*]

3. APPEAL AND ERROR (§ 1050*)—REVERSIBLE ERROR—ADMISSION OF EVIDENCE.

Where, in an invitee's action against a railroad company for an assault upon him by a vicious person at a station, the evidence to show defendant's knowledge of the assailant's disposition or its liability for the assault was far from plain, it was reversible error to permit a witness to testify that on the night before the assault, while in company with one of defendant's employés, he saw the assailant at the station in a dangerous mood, but did not see any station agent present, and said to his companion "that crazy fool will kill somebody," and that his companion "was of the same opinion."

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. Carriers (§ 283*)—Assault by Third Party—Notice.**

A railroad employé's acquiescence in a witness' expressed opinion that plaintiff's assailant was a dangerous person could not charge the railroad company with knowledge of the assailant's disposition, so as to render it liable for his subsequent assault upon plaintiff at a railroad station, where he was waiting for an arriving passenger.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1119–1124, 1140, 1141; Dec. Dig. § 283.*]

Appeal from Trial Term, Nassau County.

Action by William Blaisdell against the Long Island Railroad Company. From a judgment for plaintiff, and an order denying a new trial (131 N. Y. Supp. 14), defendant appeals. Reversed, and new trial granted.

Argued before BURR, THOMAS, CARR, WOODWARD, and RICH, JJ.

Henry A. Uterhart, of New York City (John J. Graham, of New York City, on the brief), for appellant.

Charles Blandy, of New York City (Frederick A. Card, of New York City, on the brief), for respondent.

CARR, J. About 11 o'clock at night, on April 13, 1909, the plaintiff, who was a resident of the village of Port Washington, Long Island, went to the railroad station of the defendant at that place, to await the arrival of his wife on the train from New York City. He entered the station, and found the person in charge making ready for closing. The expected train was to be the last one to arrive at that station that night. After it discharged its passengers, it was to start back to the city, leaving the station closed for business. When the plaintiff arrived, one Huppe, an employé of the defendant who was in charge of the station, was fixing the fire in the station stove for the night. The plaintiff took a seat inside the station, and turned up his coat collar, and began to doze slightly. In a few moments a person named Michael Fallon entered suddenly the station from the door which led to the platform near the tracks. He came in without any noise, and walked over directly to where Huppe was bending over the stove, with a poker in his hand. Fallon immediately demanded from Huppe whether the latter had said concerning him that, in a fight which had taken place between Huppe and Fallon about a week previously, Fallon had bitten him, Huppe. The latter made answer that he had so stated, and thereupon Fallon discharged a revolver either at or over the head of Huppe. The latter fell to the floor, and the plaintiff, who was frightened by the occurrence, started to run out of the station to the platform near the tracks. Fallon followed him out, and struck him in the mouth with the butt end of the revolver, causing him to fall to the ground. While he was lying down, he was kicked by Fallon. This occurrence, which took place in a few moments, resulted in a serious injury to one of the plaintiff's knees, whereby his power to bend it was impaired practically to the extent of three-quarters of the usual flexion. His business was that of an

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

actor in vaudeville and other kinds of performances, in which his function was to give fancy dances. The injuries to his knee are permanent, and his earning power seriously decreased. For this occurrence he brought this action against the defendant to recover damages for his injuries, on the ground that they were caused by the negligence of the defendant. From a judgment in his favor, entered upon the verdict of a jury for the sum of $9,000 damages, the defendant now appeals.

The charge of negligence, as set forth in the complaint, was that Fallon "was a dangerous and reckless person and a lunatic, and was known to the defendant and its agents and servants to be a dangerous and reckless person and a lunatic," and that the defendant, its servants and agents, employed Fallon in and about the station, and permitted him to remain in the station when not so employed, and further permitted him "to handle and use in and near the said station a loaded revolver obtained by said Fallon from the defendant and its agents and servants with their consent." At the trial it appeared that the plaintiff and Fallon had no previous acquaintance, and that the assault on the plaintiff was wholly unprovoked.

The plaintiff called a large number of witnesses, including various employés of the defendant, which itself produced no witnesses, but moved unsuccessfully to dismiss the complaint at the close of the plaintiff's case. There was some conflicting testimony in the plaintiff's case, and the learned trial court submitted the issue of the defendant's negligence to the jury, which found a verdict, as before stated, for the plaintiff. The case is somewhat exceptional in its facts. No relation of passenger and carrier existed between the plaintiff and the defendant.

[1] The plaintiff was at the station lawfully on an implied invitation of the defendant. Had the plaintiff been there as an intending passenger, having bought a ticket, and awaiting the arrival of a train, the defendant should have been obliged to use a "high degree of care" for his protection. Exton v. Central R. R. Co., 62 N. J. Law, 7, 42 Atl. 486, 56 L. R. A. 508; s. c., 63 N. J. Law, 356, 46 Atl. 1099, 56 L. R. A. 508. The measure of the defendant's duty to one who had come to its station not as a passenger, but on an implied invitation, was not so strict. "The general rule applicable to persons occupying real property for business purposes is that they must use reasonable prudence and care to keep their property in such a condition that those who go there shall not be unreasonably and unnecessarily exposed to danger. The measure of their duty is reasonable prudence and care." Flynn v. Central R. R. Co., 142 N. Y. 439, 37 N. E. 514, and cases cited. This duty extends not only to the keeping of the physical structure reasonably safe, but requires the exercise of reasonable care to prevent danger from vicious practices of third parties, of which there was knowledge in the defendant or a reasonable opportunity for knowledge had reasonable care been taken. Swinarton v. Le Boutillier, 7 Misc. Rep. 639, 28 N. Y. Supp. 53; s. c., 148 N. Y. 752, 43 N. E. 990. In the case last cited a person who had entered a department store was severely injured in one of his eyes

by the act of a "cash boy" who had "snapped a pin" in the air, either at the visitor or some other object. It was shown that the practice of snapping pins on the part of the "cash boys" had existed for several months previously, and that the defendant was chargeable with notice thereof, and had taken no steps to prevent its continuance. He was held liable accordingly for a failure to exercise reasonable care. In Dean v. St. Paul Union Depot Co., 41 Minn. 360, 43 N. W. 54, 5 L. R. A. 442, 16 Am. St. Rep. 703, the defendant was held liable for an unprovoked assault made upon one who was lawfully in the depot as a passenger by an employé of a tenant of the defendant, who was in charge of a parcel room. It was shown that the employé was of a vicious temperament and had frequently made unprovoked assaults during a period of six years on persons lawfully in the depot. The ground of liability was stated by the court as follows:

"Whatever obligation otherwise, by virtue of its contract with the carrier, rested upon the defendant as to the plaintiff, it is manifest that it was bound to use ordinary care and diligence to keep its premises in a safe condition for those who legitimately came there. It had no more right, therefore, to knowingly and advisedly employ or allow to be employed, in its depot building, a dangerous and vicious man, than it would have to keep and harbor a dangerous and savage dog or other animal, or to permit a pitfall or trap into which a passenger might step as he was passing to or from his train."

In Carpenter v. Boston & Albany R. R. Co., 97 N. Y. 494, 49 Am. Rep. 540, it was held that where a railroad company, with knowledge of the practice, had failed to prevent a practice of throwing mail bags from mail cars from its passing trains to its platform, by reason of which a person lawfully upon its platform was injured, it had failed to exercise "reasonable care," notwithstanding that the persons who threw the mail bags were not in its employment.

[2] Applying this rule, in the light of the examples cited, it was incumbent upon the plaintiff to prove that Fallon was of known vicious habits, and that the defendant with such knowledge, actual or constructive, had employed him at the station, or had harbored him there, or had permitted him to come there without any lawful business there to be done by him, and that such acts were the proximate cause of the plaintiff's injury.

[3] To sustain this burden of proof, the plaintiff gave evidence that early in the evening of the day in question Fallon was seen by third parties in an apparently drunken condition, uttering loud threats; that about 8 p. m. of said evening he had entered the station while Huppe was present, and went behind the wire door of the ticket office, and took from a cupboard a revolver owned by one of the station employés. While Huppe testified that he did not see Fallon take the revolver, and that he did not know that there was a revolver there, he admits that he saw him open the door of the ticket office partly, without making any attempt to prevent him. The door of the ticket office was unlocked at the time, and could be opened by simple pushing. Huppe was busy at the ticket case at the time. During the evening in question Fallon had drunk considerable "hard cider," and he was unquestionably drunk at the time of the assault upon the plain-

tiff. Evidence was given that Fallon had been twice committed to a state hospital for mental diseases, once in 1901 and once previously in 1899, but that in each instance he had been discharged by the authorities of the hospital after short intervals, and that the defendant's station agent, Gorman, had known that Fallon had been an inmate of the hospital; that, nevertheless, Fallon had been employed in 1907 by the same station agent as a helper on an express wagon of the defendant for upwards of a month or more; that he was seen asleep on the benches of the station at an early hour in the morning, and while the station was open for business; and that he was employed to deliver, from time to time, telegrams or telephone messages received in the station; that he was known generally in the village as "Crazy Mike"; and that his reputation for peacefulness and sobriety was bad.

A week before the assault in question he had come to the station, and there had a verbal dispute with Huppe, who ordered him to leave the station. He refused, and Huppe then ejected him violently after a scuffle, and forbade him to return. Yet on the evening of the assault Huppe saw him go into the ticket office, open the wire door, and go to a cupboard, without any attempt to prevent him. The gist of the plaintiff's proofs was that Fallon was known to be a dangerous character, and that the defendant's agents practically gave him a free run of the station, and thus encouraged him to frequent it at his pleasure. It was not shown, however, that Fallon, except as to the former quarrel with Huppe in the previous week, had ever assaulted any person at the station, or that he had ever, as an aggressor, committed any assaults elsewhere in the village. His general reputation for verbal quarrelsomeness and sobriety was said not to be good by some of the plaintiff's witnesses, though others had testified that they had never seen him drunk or quarrelsome. The plaintiff produced Fallon as a witness, and from his testimony it appeared that he took from the station the revolver in question for reasons which appear to be rather hazy; that he had drunk considerable hard cider on the night in question; that his mind had been inflamed by stories which he had heard as to what Huppe had said about the quarrel of the previous week; that he had come to the station so late at night to return the revolver; and that, when he saw Huppe, he demanded from him whether he had made the statements referred to, and that he then discharged the revolver over Huppe's head simply to frighten him, and he thereafter struck the plaintiff because he thought the latter, as an ally of Huppe, was about to attack him. He denied that he was ever forbidden to frequent the station, and he testified that he was frequently engaged to deliver telegrams, and likewise frequently swept out the station, from time to time, up to the day of the assault in question.

That he ever swept out the station after he left the employment of the defendant in 1907 was denied by the defendant's station employés. The delivery of telegrams was explained by the station employés as due to a practice on the part of the defendant to intrust such work to any person who happened to

be at the station at the time, and who was willing to undertake the matter, and to receive his compensation from the person to whom the message was addressed. This is a common enough practice at country railroad stations at small places on Long Island. There was evidence, also, that the station agent, Gorman, sometimes permitted Fallon to drive the mail wagon. After Fallon left the plaintiff's regular employment in 1907, he spent some time in the city, and, after his return to Port Washington, he was in various employments in the neighborhood. For some time preceding, and up to the occurrence of April 19th, he was employed as a driver for a small tradesman in the village, and had occasion to call at the station frequently for freight on the business of his employer. If the acts of the defendant at the precise time of this assault be scanned, it is apparent that it is not chargeable with any lack of reasonable care at that moment. Fallon came into the station suddenly and quietly, at a very late hour of the night. His misbehavior at that time was so instantaneous that there was no opportunity to eject him before the mischief was done. Nor do we think that the defendant was bound to anticipate that he would come to the station so late at night, and take means accordingly to prevent him from entering. If the defendant was guilty of negligence which was the proximate cause of the plaintiff's injuries, it must be found earlier than the time of the assault. There was no satisfactory proof to show that any of the defendant's employés employed about the station knew that Fallon was drunk at the time, or had possessed himself of a revolver. Fallon's coming there was among the possibilities; but was it so probable that one in the exercise of reasonable care should have been bound to anticipate it and to have taken steps to prevent it? We think not. Nor do we think that there was shown anything in the prior happenings that called upon the defendant to exclude Fallon from its station unless his then present conduct justified it. In any event, the question of the defendant's liability was far from plain, and, with this consideration, we think, also, that reversible error was committed in receiving certain evidence of the plaintiff's witness Kliesrath.

[4] He had testified that on "the night before the shooting" he was in a tavern about 150 feet away from the station with one Elmer Brown, who, he said, was an employé of the defendant; that he saw Fallon in the station, cursing loudly and threatening to kill somebody, but he did not see any of the station agents present. He was asked by the plaintiff's counsel what he then said to Brown. This was objected to and admitted over an exception. He answered as follows:

"I says: 'That crazy fool will kill somebody some day, and they can't do nothing to him with the exception of putting him in a lunatic asylum. That is all they can do.'"

Not content with this, plaintiff's counsel again asked the witness what Brown answered. Over objection and exception the witness was allowed to answer, and he said: "Well, he said he was of the same opinion I was." It does not appear from any testimony in the record who Brown was, or what was his connection with the defendant, other than the general statement of the witness that he was an

employé of the defendant. It is argued by the respondent that this evidence was admissible to prove notice to the defendant through Brown. But the opinion of Kliesrath as to Fallon's future conduct was no part of such notice; nor had Brown any power to bind the defendant by any expression of agreement in the opinion of Kliesrath as a part of a conversation in an adjoining tavern. We think this evidence was highly prejudicial to the defendant, and that it was error to receive it.

The judgment and order should be reversed and a new trial granted, costs to abide the event. All concur.